**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Osvaldo Boves,<br><br>Plaintiff,<br><br>v.<br><br>Aaron's, Inc.,<br>and David Epright,<br><br>Defendants | **COMPLAINT**<br><br>Case No. 18-cv- ( )<br><br>Jury Trial Demanded |

Plaintiff, by and through his attorney, Gregory Antollino, hereby files this Complaint against Defendants, and state as follows:

## NATURE OF THE ACTION

1. This is a sexual orientation discrimination and retaliation action brought under diversity of citizenship jurisdiction. Allegations of consumer fraud are intertwined. The complaint might be amended to include a claim for sex discrimination depending on the development of the law under Title VII.

## JURISDICTION & VENUE

2. Jurisdiction currently exists under diversity of citizenship insofar as plaintiff is a citizen of New York, and, upon information and belief, defendant Aaron’s is a citizen of Georgia and Delaware and defendant Epright is of New Jersey.

3. Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) in that some of unlawful conduct alleged in this Complaint occurred in this District.

## PARTIES

4. Aaron's is an equipment sales and leasing company with stores across the United States and over ten thousand employees. Plaintiff has been working there in various incarnations since 2010, and Epright, his supervisor, at some time before him.

## FACTUAL ALLEGATIONS

5. Osvaldo Boves has worked for Aaron's, which has franchises all over the United States and Canada (although Osvaldo work in corporate) since 2010.

6. He started as a manager trainee and was promoted multiple times. Osvaldo was, as of early August a Regional Manager for the Northeast, when he learned he was "politely" told to take a step down to store manager. He was never counselled, coached, put on a performance plan. He was replaced by a lower-performing worker.

7. This Osvaldo found humiliating and it will cost him money between bonuses and profit sharing.

8. He is convinced a motivating factor in this action was based on his sexual orientation.

9. Upon information and belief, and subject to further discovery, his demotion might also have been a violation of the New York General Business Law § 349

insofar as he was demoted to allow Epright to promote a general manager in order to engage in deceptive business practices. Aaron's rents equipment, but it is also a lender of money; it has been the target of improper business practices in the past for violations, among other things, violations of the Fair Debt Collections Practices Act.

10. In either case, there is no explaining Boves' demotion and he deserves redress.

11. In early August 2017, Osvaldo was at a Regional Manager's meeting in Baltimore. Osvaldo believes it was known among many people at work that his is gay and he is not closeted about; although he is not certain to what extent. Something happened in August that made it certain that Osvaldo was known as gay.

12. The regional manager's meeting led to his introduction to a waitress at a bar the people attended. A third-party suggested Osvaldo might be interested in her romantically or vice versa.

13. She put her hand on Mr. Boves' head in a delicate but manner suggesting she was interested.

14. Simply to ease an awkward situation, in which Osvaldo didn't want the woman to be insulted by his lack of interest, Osvaldo said, "Oh, you're very pretty, but I am gay."

15. A few people reacted in surprise but nothing was said that was insulting, at least as Osvaldo heard. The next day, however, when the managers returned to work, it was a topic of conversation.

16. When Osvaldo returned to work at New York, my manager started making complaints about his work, although he had never done so before.

17. Mr. Boves, in fact, was promoted repeatedly. He never received an evaluation even though his numbers were up to expectation and evaluations were expected.

18. His region became profitable overall. There was no reason for Epright to treat him this way, at least not based on his performance in comparison to others.

19. Osvaldo also found that Epright was visiting his stores when plaintiff was not at them, without his knowing, and after telling him to meet him at a different store. This would ensure that Epright would have free right to explore.

20. He believes Epright was looking for something to justify a change in the terms of his employment, or otherwise nefarious.

21. Eventually, Epright told him to go on vacation. Boves had been asking for this for a while.

22. He took the vacation and when he returned, he learned he had been demoted.

23. The person who replaced him was one of his General Managers, who was doing worse than she should have been, and her numbers had dropped to the point that Aaron's reduced her salary.

24. While Osvaldo was on vacation, Epright told this person, Nia Quinoñes to apply for Boves' position because he knew he needed a backup. There was no reason for this, and Human Resources could not believe it had happened

25. Osvaldo believe this occurred of his stating Osvaldo he was gay in Baltimore or because of his sex alone. It could not have been based on performance because Osvaldo was replaced by someone who had just had a huge cut in salary, whereas Osvaldo never suffered any discipline or warning.

26. Osvaldo was given no reason for the demotion except, that "the best way for him to protect you is for you to go back into a store."

27. Osvaldo reasonably took this as an admission that a lack of visibility in the company would let him keep his job.

28. When Osvaldo arrived as manager of the store, however, he noticed not only that the profits they showed were *false* (in fact there was no profit), but there were numerous compliance issues, including the misuse of customer credit card numbers, many of which were written on post-it notes, missing customer files, inventory assigned to customers without signed lease agreements and unsigned club memberships added to accounts *without the customers' consent or knowledge.* This is against Aaron's policies and the law.

29. Osvaldo had none of those problems at his store, and Epright oversaw both him and Tino Martinez, the manager of the new store, which is in the Bronx. But he promoted Tino.

30. In addition, going back in 2017, Mr. Epright continually complained about Mickey Townes, another woman who is a lesbian and whom Osvaldo supervises and

who is a good performer. Epright said things about her such as, “She shouldn’t be working here.” Or, she “wouldn't be working for me if I [Epright] were her boss.” However, he added, “I can't confront her the way you would.”

31. On the other hand, there was a straight man who was a horrible manager whom Epright would not allow him to take him out of position. Mr. Boves had tried to because this employee’s numbers and performance were not up to par. Upon information and belief, Epright was looking for people who would go along with inflating the stores’ profitability without complying with the rules. For example, having a customer’s credit card number handy to pay his or her bill is wonderful, but it is supposed to take place within the company’s electronic filing system, with full disclosure.

32. In early fall 2017, Mr. Boves made a complaint to the EEOC based on its filing charge practices at the time and hopefully going forward, to wit, that sexual orientation discrimination is merely a form of sex discrimination because, among other things, sex is a motivating factor in the decision to take adverse action.

33. This is an emerging area of the law, however, but might be clarified soon.

34. Aarons would not mediate the claim, so it was sent for investigation. Soon, more than six months will have passed and plaintiff has asked the EEOC for a right-to-sue letter.

35. He knows that defendants are aware of his complaint because on December 8, 2017, a human resources manager called him and said the company was aware of his EEOC complaint and no one knew about it except this particular manager and the legal department.

36. The manager said, “I'm sorry you had to go through that. All I know about this is that one day you were demoted, and I thought to myself, ‘Really, Ozzie? Out of all people?’”

37. This implied that the manager didn't understand why Boves was demoted because he was a good worker and didn’t deserve to be.

38. The manager then added, “I'm glad you did what you did because something is wrong and something has to be done about this.”

39. The manager said she didn't know about his sexual orientation. Plaintiff cannot dispute that, however, many people – “everyone” was the word he used – including Epright, whom he spoke with about his partner, knew that Boves is gay.

40. Indeed, a day or a few before he was taken out of position (the phrase for demotion), Epright met Boves at an Aaron’s store and they went to a deli in Westbury, Long Island.

41. At the Deli, Epright asked Boves why he didn't want to remain in Connecticut (where he had previously lived).

42. He replied that his partner had taken a job in Manhattan, so it didn't make sense to remain in Stamford.

43. Epright's response was, "What does *he* do?" He used the male pronoun; there was no word play. Boves told him he works in artificial intelligence, which they chatted about for a bit.

44. Plaintiff is certain his sexual orientation was known and his openness about it. One sales manager, for example, Dominique Lagos, asked him about his relationship with his significant other, whom she referred to as a male.

45. Shortly after the call from Human Resources about the EEOC charge, on December 28th, 2017, plaintiff was called to a meeting with many other managers.

46. The meeting lasted all day, and during it, a series of events took place creating discomfort pertaining to plaintiff's complaint of differential treatment.

47. The environment became tense, then hostile. The meeting started with a discussion of stores' performances, scheduling and expectations for 2018.

48. Shortly after that, it moved into a presentation by the Divisional Human Resources Representation. This presentation lasted approximately one hour.

49. During the presentation, the representative spoke about sexual harassment and discrimination at the workplace. A PowerPoint presentation showed all protected classes under law and all General Managers, Regional Managers and Regional

Directors were taught the law and the consequences of treating people different as to hiring, promoting, pay increases and other things.

50. There was a lot of tension in the air, especially when the subject of sexual orientation came up. A picture of two men and a baby was placed beside a heterosexual couple and a baby and the point was that neither relationship had lesser value.

51. This was a fine enough point to make – if a little late – but people became uncomfortable and giggled. Epright walked out of the meeting at this point and didn't return until the end.

52. Plaintiff joined the company in 2010, and attended maybe dozen meetings like this and not once was sexual orientation a topic, even though it is a protected class in a minority of states and was always in New York and New York City.

53. To its credit, although too late, the HR representative spent approximately twenty minutes on the subject for the first time ever.

54. The PowerPoint presentation showed a picture of a gay couple, "Michael and Ryan" holding a baby girl. The representative talked about a scenario where behavior would be considered discrimination based on sexual orientation if the two couples were treated differently or their relationship of lesser value.

55. When the picture about the gay couple was presented, many associates at the meeting chuckled and some seemed squeamish, turning in their chairs and looking at each other.

56. Plaintiff was extremely uncomfortable – not because of the issue itself but because everything going on pertained to plaintiff's complaint and it was being addressed indirectly and indelicately.

57. On the one hand, he was glad that this was happening, but just after he filed his complaint? He felt targeted and without defenses.

58. After the presentation, the managers present were given two pieces of papers with goals and standards for 2018, and were told by Regional Manager Tino Martinez that those standards were going to be effective on January 1, 2018 and that General Managers will find themselves at the unemployment line by February if they didn't start hitting those numbers.

59. Epright said after that every general manager had to sign the forms and that if someone did not agree "for some reason" to let him know at that moment.

60. Mikki Townes, an openly gay woman, raised her hand and explained that she was running her store with only two associates, that she needed help and that she knew that there was no way that she was going to be able to hit those numbers.

61. She was told by David rudely that she was in the wrong industry.

62. She replied by saying that her store was hitting numbers before when she had staff and that she had been asking help for months.

63. She said she wasn't in the wrong industry, but that she just needed help with staffing.

64. Tino and David then attacked Mikki, saying that she was being too defensive and needed a different career.

65. Plaintiff raised his hand and asked for permission to speak. He was protective, saying not only that Mikki was not being defensive, but that many managers felt the same way because of how the information was being delivered and the threat of unemployment pressured managers to conduct business unethically – i.e., by having credit cards lying around and by duping customers into renewals and memberships they hadn't signed up for.

66. Plaintiff also said that he didn't have any issues with striving for excellence or hitting company's standards, bur that she just needed workers.

67. It is important to know, that as of that day plaintiff's store was hitting and exceeding numbers, beating company averages in the top 20 in percent collected properly.

68. The percentage of non-renewals was one of the lowest in the region and the Division. When plaintiff turned around the Bronx store, Aaron's realized his value

and asked him in a general manner – with no specific offer – if he would be interested in regaining his old position.

69. Nevertheless, when plaintiff finished talking, Epright approached him at the side and said to him: "I will walk in into your store and I will fire you" for multiple issues that were not part of the agenda, that plaintiff had actually turned around in his demoted position: Updating customer information, the "7/15 rule," "40 calls per hour field visits," "30 daily or 150 weekly." These are all shorthand rules and goals Aarons has in place that can be manipulated by having credit card information in the store for easy monetary manipulation.

70. That this statement was made in front of 20 other managers humiliated plaintiff whose reputation was harmed.

71. Everything plaintiff does, or doesn't do gets amplified in a way that has consequences than the same conduct than other General Managers. His numbers are better, his contracts going into collection are lower percentage-wise and debts collected are higher. Sales are better, the store is growing in customers, but Epright felt such anger that he addressed Boves personally in front of all General Managers and said that he would walk into his store and fire him.

72. In fact, Boves had just finished cleaning the mess left behind by a regional manager that Epright promoted out of Boves' current store (C1575 in the Bronx), where he is filling boxes of missing lease agreements, and sharing books of credit

card numbers that were left behind. He then recovered the store losses of thousands of dollars lost in revenue during September and October due to fake deals typed up just to show better numbers.

73. Plaintiff, however, runs a clean operation with absolute integrity, and all his metrics are improving drastically. His staff embraces all company initiatives and follow them. They also follow compliance with credit card numbers EZ-Pay, the company's credit card machine mechanism, customer agreements and cash flow

74. But David humiliated plaintiff by stating that he would walk into his store and fire him. And the charge is repeated by the same person who left the store a mess, Quintino Martinez: That he will be at the unemployment line if he doesn't sign the paper and hit those numbers, even though plaintiff is hitting better numbers with integrity and without fraud.

75. In addition, a few days before the December 28th meeting, Quintino Martinez came to plaintiff's store with the excuse that he was going to work from there because he had a meeting nearby.

76. During the day, he waited until plaintiff wasn't around and approached one of Boves' team members, asking him if he still had "the credit cards books that they were using when Martinez was the general manager of the store." Again, these credit card books are a relic of the past and not compliant with company policy.

77. Later, Quintina lied to Epright that Boves was using credit card books

78. Epright knew this was not true. The only books were the ones that Quintana left behind that took plaintiff weeks to input properly into the computer to clear all customer complaints of credit card payments being processed without the customer's authorizations.

79. The reality is that ever since plaintiff's EEOC complaint, in which the differential treatment was outlined in general terms, everything plaintiff does is examined microscopically.

80. Everything he does is a bigger deal than other managers' actions, even though all of his metrics are improving, better than the store has done in years, well before he arrived.

81. As a result of the foregoing, plaintiff has been damaged and demands redress.

## FIRST CAUSE OF ACTION
## SEXUAL ORIENTATION DISCRIMINATION IN VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW

82. Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein.

83. New York City Human Rights Law 8-107, et seq., and amendments thereto, make it an unlawful employment practice to fail or refuse to discriminate against any individual in any manner if sexual orientation is a motivating factor in the adverse action taken with respect to his or her compensation, or terms or conditions, or privileges of employment.

84. Through the conduct alleged in this Complaint, Defendant violated the New York City Human Rights Law by demoting plaintiff and otherwise treating him differently, based on his sexual orientation.

85. Through the conduct alleged in this Complaint, Defendants violated the New York City Code.

86. Plaintiff demands damages, punitive and compensatory, and possible equitable relief.

**COUNT II**
**RETALIATION UNDER THE NEW YORK CITY HUMAN RIGHTS LAW**

87. Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

88. The New York City Human Rights Law makes it illegal to retaliate against an employee by doing anything that would deter him or her to make a complaint of discrimination.

89. Acts since plaintiff filed his EEOC charge have retaliated against plaintiff by further harming his reputation in the company after being demoted for no reason.

90. Through the conduct alleged in this Complaint, Defendant retaliated against plaintiff because of good-faith statements made in the EEOC charge.

## COUNT III
## VIOLATION OF GENERAL BUSINESS LAW § 349

91. Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein.

92. Aaron's is a business under General Business Law § 349.

93. Defendant Aaron's or Epright or both deceived consumers in manners disallowed by Aaron's policies or GBL § 349 itself or other consumer protection laws.

94. Epright, whether intending to utilize plaintiff's skills to clean up § 349 violations created by others, or because plaintiff is of good ethical character and would never violate these laws or precepts, treated plaintiff disparately.

95. Plaintiff has thus been damaged, however indirectly, by violations of § 349 and demands damages, compensatory and punitive, and attorneys' fees.

WHEREFORE, Plaintiff respectfully request that this Court find against Defendant as follows:

a. Order Plaintiff reinstated to his appropriate position and seniority, and otherwise make Plaintiff whole;

b. Award Plaintiff the value of all compensation and benefits lost and that will be lost in the future as a result of Morgan Stanley's unlawful conduct,

including front and back pay and compensatory damages for emotional distress and loss of reputation;

c. Award Plaintiff compensatory and punitive damages well in excess of $75,000, the jurisdictional minimum;

d. Award Plaintiff prejudgment interest and attorneys' fees, costs and disbursements, as provided by law;

e. Award Plaintiff such other relief as this Court deems just and proper.

Dated: New York, New York
January 1, 2018

By: */s/ Greg S. Antollino*
Gregory Antollino, Esq.
Attorney for Plaintiff
275 Seventh Avenue # 705
New York, NY 10001
(212) 334-7397